**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cruz Fernandez, | No. CV-23-01034-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of his application for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 11), the Commissioner's answering brief (Doc. 13), and Plaintiff's reply (Doc. 14), as well as the Administrative Record (Doc. 8, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.    <u>Procedural History</u>

Plaintiff filed an application for benefits on July 9, 2020, alleging disability beginning on September 9, 2018. (AR at 13.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels. (*Id.*) On June 27, 2022, following a telephonic hearing, the ALJ issued an unfavorable decision. (*Id.* at 13-30.) The Appeals Council later denied review. (*Id.* at 1-3.)

…

…

## II.    The Sequential Evaluation Process and Judicial Review

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process.  20 C.F.R. § 416.920(a).  The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  At the first step, the ALJ determines whether the claimant has engaged in substantial, gainful work activity.    20 C.F.R. § 416.920(a)(4)(i).  At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment.  *Id*. § 416.920(a)(4)(ii).  At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  *Id*. § 416.920(a)(4)(iii).  If so, the claimant is disabled.  *Id.*  If not, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to step four, where the ALJ determines whether the claimant is still capable of performing past relevant work.  *Id*. § 416.920(a)(4)(iv).  If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience.  *Id*. § 416.920(a)(4)(v).  If not, the claimant is disabled.  *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (internal quotations omitted).  The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole.  *Id.*  Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).  In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision.  *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III.   <u>The ALJ's Decision</u>

The ALJ concluded that Plaintiff had not engaged in substantial, gainful work activity since the alleged onset date and that Plaintiff had the following severe impairments: "bipolar disorder II; major depressive disorder; borderline intellectual functioning; social anxiety disorder with agoraphobic features; and obsessive-compulsive disorder."  (AR at 16.)[1]  Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listing.  (*Id*. at 16-20.)  Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple routine tasks.  The claimant can make simple work-related decisions in a routine work setting.  The claimant is able to perform tasks that do not involve fast paced production requirements like those found in assembly line work or in a fast-food restaurant during mealtime.  The claimant can have occasional interaction with supervisors. The claimant can have occasional and superficial interaction with coworkers and the public such that the interaction is brief, casual and incidental to the task performed.

(*Id*. at 20.)

As part of this RFC determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (*Id*. at 22.) Additionally, the ALJ summarized the third-party function reports submitted by Cristina Gonzalez (Plaintiff's mother), Alfredo Oliva ("unknown relationship"), and Azteca Fernandez (Plaintiff's sister).  (*Id*. at 21-22.)

The ALJ also evaluated opinion evidence from various medical sources, concluding as follows: (1) Dr. Fair, state agency psychological consultant ("persuasive"); (2) Dr. D'Adamo, state agency psychological consultant ("persuasive"); (3) Dr. Webster, consultative examiner ("partially persuasive"); (4) Dr. Morton, treating physician

---

[1]     The ALJ also determined that Plaintiff had the non-severe impairment of obesity. (AR at 16.)

- 3 -

1   ("partially persuasive"); (5) Mr. McCarthy, PMHNP[2] ("not . . . persuasive"); and (6) Dr.

2   Geary, psychological examiner ("not . . . persuasive").  (*Id.* at 24-28.)

3       Based on the testimony of a vocational expert ("VE"), the ALJ concluded that

4   although Plaintiff had no past relevant work, he is capable of performing three jobs that

5   exist in significant numbers in the national economy: (1) hand packager, (2) store laborer,

6   and (3) airport maintenance.  (*Id.* at 28-30.)  Thus, the ALJ concluded that Plaintiff is not

7   disabled.  (*Id.* at 30.)

8   IV.   Discussion

9       Plaintiff raises what the Court perceives to be six issues on appeal: (1) whether the

10  ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Morton;

11  (2) whether the ALJ failed to provide legally sufficient reasons for rejecting the opinions

12  of PMHNP McCarthy; (3) whether the ALJ failed to provide legally sufficient reasons for

13  rejecting the opinions of Dr. Geary; (4) whether the ALJ failed to provide legally sufficient

14  reasons for rejecting Plaintiff's symptom testimony; (5) whether the ALJ failed to provide

15  legally sufficient reasons for rejecting the lay-witness testimony; and (6) whether the ALJ

16  provided a flawed hypothetical question to the VE during step five.  (Doc. 11 at 1-2.)  As

17  a remedy, Plaintiff seeks a "remand for an award of benefits, or, as a lesser alternative,

18  remand this case for a new hearing and further administrative proceedings."  (*Id.* at 20.)

19      A.   **Dr. Morton**

20           1.   Standard Of Review

21      In January 2017, the SSA amended the regulations concerning the evaluation of

22  medical opinion evidence.  *See Revisions to Rules Regarding Evaluation of Medical*

23  *Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations apply to applications

24  filed on or after March 27, 2017, and are therefore applicable here.  The new regulations

25  provide in relevant part as follows:

26      We will not defer or give any specific evidentiary weight, including
27      controlling weight, to any medical opinion(s) or prior administrative medical

28  _____

   [2]   This acronym stands for psychiatric-mental health nurse practitioner.

finding(s), including those from your medical sources. . . .   The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a).   Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be."   *Id.* § 404.1520c(c)(1).   Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."   *Id.* § 404.1520c(c)(2).[3]

The Ninth Circuit has confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).   Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies.   Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."   *Id.*   With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.   The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings."   *Id.* at 792 (cleaned up).   Although "an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and

---

[3]     Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider.   *Id.* § 416.920c(c).

1   whether the medical source has examined the claimant or merely reviewed the claimant's

2   records. . . . [t]he ALJ no longer needs to make specific findings regarding these

3   relationship factors . . . ." *Id.* (citation omitted).

4               2.      Dr. Morton's Opinions

5          On August 19, 2020, Dr. Morton wrote a one-page letter concerning Plaintiff and

6   also filled out a one-page form entitled "Psychological/Psychiatric Medical Source

7   Statement." (AR at 492-93.)

8          In the letter, Dr. Morton noted that he had seen Plaintiff "for 12 sessions between

9   3/21/16 and 7/20/17" and had also seen Plaintiff on four occasions between June 2020 and

10  August 2020. (*Id.* at 492.) After providing a brief summary of those meetings, Dr. Morton

11  opined:

12          In sum, [Plaintiff] appears to be a young man with a mix of anxiety,
            depression, and thinking issues. While he is bright, he lacks the social and
13          communication skills to interact adequately with people he does not know.
            He shows deficits in his ability to sustain focus and tolerate change. As for
14          his functional capacity, he possesses the intellectual ability to understand and
            comply with work instructions. However a combination of thinking
15          difficulties, anxiety, depression, and rigidity would interfere with sustained
            task completion. [Plaintiff] has intrusive thoughts, poor sleep, and social
16          fears. It was hoped that psychotropic medication would help these issues but
            past attempts have not been successful. It is my understanding he is now
17          seeing a new psychiatric provider and perhaps there will be some
            improvements which might also make him more amenable to psychological
18          assistance. But, to this point in time, he does not appear to be functioning at
            a level in which he could maintain competitive employment.
19

20

21

22  (*Id.*)

23         Meanwhile, in the form, Dr. Morton evaluated Plaintiff's functional capacity in four

24  areas. First, as for "Understanding and Memory," Dr. Morton wrote: "He possesses the

25  intellectual ability to understand and comply with instructions." (*Id.* at 493.) Second, as

26  for "Sustained Concentration and Persistence," Dr. Morton wrote: "His mix of thinking

27  and emoti[onal] difficulties would make it unlikely he could sustain focus." (*Id.*) Third,

28  as for "Social Interaction," Dr. Morton wrote: "He is socially anxious and borderline

paranoid regarding others thus he would struggle in this area." (*Id.*)   Fourth, as for "Adapting to Change," Dr. Morton wrote: "[Plaintiff] is rigid regarding his routine.  He would become anxious and not handle changes well." (*Id.*)

### 3.   The ALJ's Evaluation Of Dr. Morton's Opinions

As noted, the ALJ deemed Dr. Morton's opinions "partially persuasive." (*Id.* at 26.) The ALJ's full rationale was as follows:

> The undersigned finds Dr. Morton's opinion partially persuasive as the record is consistent with moderate limitations however Dr. Morton does not support, with treatment notes or analysis, the severity of the limitations opined.  At time of the report, Dr. Morton had only met with the claimant four time in the last three years.  The medical evidence supports that the claimant suffers from bipolar disorder II; major depressive disorder; borderline intellectual functioning; social anxiety disorder with agoraphobic features; and obsessive-compulsive disorder.   The claimant attended outpatient therapy and was prescribed psychiatric medication, however he testified he no longer does either.  The claimant reported he has struggled with depression, social anxiety with panic, obsessions and compulsions since he was a child.  He reported doing rituals for three to five hours a day.  The claimant had a depressed and anxious mood.  At times, he had an obsessional and depressive and thought content, which is consistent with moderate limitations.  However, the claimant is able to perform within the above residual functional capacity.    The claimant demonstrated average intelligence, which is consistent with the IQ testing results being in the low average range.  The claimant had a normal memory.  He was able to maintain attention and focus.  The claimant was able to recall three, of five, words after a delay.  He was also able to repeat five numbers forwards and three backwards.  Further, the claimant was able to perform serial 7's.  He was able to repeat, word for word, two sentences dictated to him.   [H]e was cooperative and made eye contact.  On occasion, the claimant had a normal mood and affect.  Moreover, the claimant had a logical thought process.  He had normal insight and judgment.  At times, the claimant had a normal thought content.  For the aforementioned reasons, the undersigned Dr. Morton's opinion partially persuasive.

(*Id.* at 26-27, citations omitted.)

### 4.   The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of Dr. Morton's opinions was flawed

because (1) the ALJ acknowledged that Plaintiff's "rituals cant take up to 3-5 hours per day" but nevertheless concluded that Plaintiff would be able to sustain work; (2) the ALJ falsely "implie[d] that [Plaintiff] simply stopped taking psychotropic medication and going to therapy," when in fact Plaintiff "attempted between 15 and 20 different psychotropic medications and experienced severe side effects and/or no therapeutic benefit from each one; (3) the ALJ incorrectly stated that Plaintiff has "average intelligence," when in fact Plaintiff received borderline or low-average scores on certain intelligence tests and was found to have borderline intellectual functioning at step two; (4) the ALJ incorrectly stated that Plaintiff has a "normal memory," when in fact certain tests showed that Plaintiff was in "the borderline to extremely low range"; and (5) the ALJ "took a few of the normal examination findings out of context and failed to appreciate the overall picture that Dr. Morton assessed." (Doc. 11 at 8-10.)  Additionally, Plaintiff faults the ALJ for providing the "same rationale for each medical opinion . . . regardless of whether the ALJ found any of these opinions to be persuasive or not persuasive.  [Plaintiff] submits that this further demonstrates the ALJ's improper evaluation of each of the medical opinions."  (*Id.* at 14.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting Dr. Morton's opinions (albeit while not addressing all of Plaintiff's individual criticisms).  (Doc. 13 at 10-11.)  More specifically, the Commissioner first argues that the ALJ permissibly discounted Dr. Morton's opinions pursuant to the supportability factor because Dr. Morton "did not provide any objective findings to support his extreme limitations" and failed to provide any "treatment notes . . . that support" his assessed limitations.  (*Id.*)  Next, the Commissioner argues that the ALJ permissibly discounted Dr. Morton's opinions pursuant to the consistency factor because: (1) Dr. Morton's opinion that Plaintiff could not interact adequately with strangers was inconsistent with various medical records that "documented cooperative behavior, intact eye contact, and at times, normal mood and effect" during medical appointments, as well as with Dr. Webster's opinion that Plaintiff had only mild impairment in social interactions; and (2) Dr. Morton's opinion that Plaintiff had significant difficulty completing tasks was inconsistent with the

medical records showing that Plaintiff "demonstrated normal thought process, thought content, memory, attention, and focus" during examinations, as well as with the evidence that Plaintiff scored in the "low average" range on IQ tests.  (*Id.* at 11.)

In reply, Plaintiff repeats the arguments concerning Dr. Morton raised in his opening brief without specifically addressing the Commissioner's arguments.  (Doc. 14 at 2-4.)

### 5.  Analysis

The ALJ's evaluation of Dr. Morton's opinions was free of harmful error.  As noted, "[t]he agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings."  *Woods*, 32 F.4th at 792 (cleaned up).  Here, the ALJ expressly considered both factors in relation to Dr. Morton.  (AR at 26.)

The ALJ's conclusion as to each factor was also supported by substantial evidence.  Beginning with the supportability factor, the ALJ stated that "Dr. Morton does not support, with treatment notes or analysis, the severity of the limitations opined" and that "[a]t time of the report, Dr. Morton had only met with the claimant four times in the last three years." (*Id.*)  These are valid reasons for discounting a medical source's opinions pursuant to the supportability factor.  *Cf. Jody H. v. Comm'r of Soc. Sec.*, 2024 WL 1328656, *4 (W.D. Wash. 2024) ("Here, outside of Dr. Abraham's answers, the questionnaire includes no objective medical evidence, explanation, or citations to the overall record.  Plaintiff's record also contains no treatment notes that could have been the bases for the physician's opinion, and Plaintiff does not direct to Court to any such records.  Dr. Abraham's opinion lacks supportability, therefore the ALJ did not err in rejecting it.").  *See also Woods*, 32 F.4th at 787 (noting that "an ALJ can still consider the length and purpose of the treatment relationship" and "the frequency of examinations").  Indeed, Plaintiff does not acknowledge—much less attempt to challenge—this portion of the ALJ's analysis concerning Dr. Morton.  Instead, Plaintiff only challenges other facets of the ALJ's analysis.

As for the consistency factor, the ALJ identified an array of reasons why it

1    undermined the persuasiveness of Dr. Morton's opinions.  One of those reasons was that

2    Dr. Morton's opinion regarding Plaintiff's social-interaction limitations—namely, that

3    Plaintiff  "lacks the social and communication skills to interact adequately with people he

4    does not know" (AR at 492)—was inconsistent with the evidence showing that Plaintiff

5    "was able to maintain attention and focus" and "was cooperative and made eye contact"

6    during various evaluations performed by other providers.  (*Id.* at 26-27.)  This conclusion

7    is supported by substantial evidence.  For example, the consultative examiner, Dr. Webster,

8    wrote that although Plaintiff "may have some mild impairment with his social interactions

9    as he does not like to be around other people," Plaintiff "was able to maintain attention and

10   focus" during the consultative examination and "was attentive during the evaluation."  (*Id.*

11   at 500.)   Likewise, following an hour-long intake assessment in July 2020, a medical

12   provider at Native Health wrote that Plaintiff displayed a "cooperative" attitude toward the

13   examiner and "average" eye contact.  (*Id.* at 472.)  It was rational for the ALJ to conclude

14   that these observations were inconsistent with Dr. Morton's opinion that Plaintiff would be

15   unable to interact adequately with people he did not know, and "[w]hen evidence

16   reasonably supports either confirming or reversing the ALJ's decision, we may not

17   substitute our judgment for that of the ALJ."  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th

18   Cir. 2014) (citation omitted).  *See also Thomas*, 278 F.3d at 954 ("Where the evidence is

19   susceptible to more than one rational interpretation, one of which supports the ALJ's

20   decision, the ALJ's conclusion must be upheld.").

21          In light of these conclusions, it is unnecessary to address Plaintiff's challenges to

22   some of the ALJ's other reasons for discounting Dr. Morton's opinions pursuant to the

23   consistency factor.  Even assuming those other reasons were unsupported by substantial

24   evidence, any error was harmless in light of the ALJ's identification of at least one valid

25   ground for discounting Dr. Morton's opinions pursuant to both the supportability and

26   consistency factors.  *Cf. Woods*, 32 F.4th at 793 n.4 (suggesting that even if an opinion is

27   supported, an ALJ may properly find it unpersuasive pursuant to the consistency factor);

28   *Palmer v. O'Malley*, 2024 WL 1904347, *1 (9th Cir. 2024) ("[T]he ALJ's conclusion that

Dr. Young and Dr. Koss-Leland's opinions are inconsistent with the [medical evidence] is supported by substantial evidence.  Accordingly, to the extent the ALJ erred by failing to clearly articulate how she considered the supportability factor, any such error was harmless.").  For similar reasons, the Court declines Plaintiff's invitation to categorically reject the ALJ's analysis concerning Dr. Morton because the ALJ repeated the same analysis, often verbatim, when analyzing the opinions of other medical sources.  Although this approach is not confidence-inspiring, it does not provide a basis for reversal when, as here, the ALJ expressly considered the required factors and made conclusions as to each factor that are supported by substantial evidence.  *Cf. Darling v. Kijakazi*, 2023 WL 4103935, *2 (9th Cir. 2023) ("[W]here it is clear that the ALJ considered the opinions and made separate findings supported by substantial evidence which obviated the need for a full discussion of the medical opinions of these four practitioners, any lack of specificity in the ALJ's decision is harmless.").

B.  **PMHNP McCarthy**

1.  Standard Of Review

The ALJ's evaluation of PMHNP McCarthy's opinions is subject to the same standard of review, set forth in Part IV.A.1 above, that governs the ALJ's evaluation of Dr. Morton's opinions.

2.  PMHNP McCarthy's Opinions

On February 11, 2021, PMHNP McCarthy filled out a three-page checkbox form entitled "Mental Residual Functional Capacity Assessment."  (AR at 504-06.)  Among other things, PMHNP McCarthy checked boxes indicating that Plaintiff would have "moderately severe" limitations in his ability to maintain attention and concentration for extended periods and would have "moderate" limitations in his abilities to interact appropriately with the general public and to ask simple questions or request assistance.  (*Id.* at 504-05.)  In the final section of the form, which allowed PMHNP McCarthy to provide a narrative, PMHNP McCarthy wrote: "Client receives on-going treatment every 3-4 weeks for psychiatric support.  Limitations are references above in terms of capacity.  Unable to

fully provide employment limitations as we do not have client's employment history.  The above time period [*i.e.,* July 30, 2020 to February 11, 2021] referenced client's treatment as start date to present.  Client has not discharged from services and continues to receive on-going support until client sees fit to no longer need services or has fully met his treatment goals." (*Id.* at 506.)

### 3. The ALJ's Evaluation of PMHNP McCarthy's Opinions

As noted, the ALJ deemed PMHNP McCarthy's opinions "not . . . persuasive." (*Id.* at 27.)  The ALJ's full rationale was as follows:

> The undersigned does not find Mr. McCarthy's opinion persuasive as the severity was not supported by treatment notes nor analysis and is inconsistent with longitudinal record.  The medical evidence supports that the claimant suffers from bipolar disorder II; major depressive disorder; borderline intellectual functioning; social anxiety disorder with agoraphobic features; and obsessive-compulsive disorder.  The claimant attended outpatient therapy and was prescribed psychiatric medication, however he testified he no longer does either.  The claimant reported he has struggled with depression, social anxiety with panic, obsessions and compulsions since he was a child.  He reported doing rituals for three to five hours a day.  The claimant had a depressed and anxious mood.  At times, he had an obsessional and depressive and thought content, which is consistent with moderate limitations.  However, the claimant is able to perform within the above residual functional capacity.  The claimant demonstrated average intelligence, which is consistent with the IQ testing results being in the low average range.  The claimant had a normal memory.  He was able to maintain attention and focus. The claimant was able to recall three, of five, words after a delay.  He was also able to repeat five numbers forwards and three backwards. Further, the claimant was able to perform serial 7's. He was able to repeat, word for word, two sentences dictated to him.  [H]e was cooperative and made eye contact.  On occasion, the claimant had a normal mood and affect.  Moreover, the claimant had a logical thought process. He had normal insight and judgment.  At times, the claimant had a normal thought content. Therefore, the undersigned does not find Mr. McCarthy's opinion persuasive.

(*Id.* at 27, citations omitted.)

### 4. The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of PMHNP McCarthy's opinions was

flawed because the ALJ "us[ed] almost word-for-word the rationale she used to discount Dr. Morton's opinion" and "relied on virtually the same out of context list of the more normal examination findings in finding Dr. Morton's opinion less persuasive.  The ALJ's analysis is full of factual inaccuracies and not supported by the record."  (Doc. 11 at 11.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting PMHNP McCarthy's opinions.  (Doc. 13 at 12-13.)  More specifically, the Commissioner first argues that the ALJ permissibly discounted PMHNP McCarthy's opinions pursuant to the supportability factor because PMHNP McCarthy "provided no objective findings to support his opinion."  (*Id.* at 12.)  Next, the Commissioner argues that the ALJ permissibly discounted PMHNP McCarthy's opinions pursuant to the consistency factor because "the ALJ pointed to multiple mental status examinations, including from [PMHNP] McCarthy, that documented largely normal findings, including normal behavior, eye contact thought process, thought content, memory, attention, focus, insight, and judgment."  (*Id.*)  Finally, the Commissioner argues that any error as to PMHNP McCarthy was harmless because PMHNP McCarthy "indicated the time period covered by his assessment was from July 2020 to February 2021—eight months," yet under 42 U.S.C. § 423(d)(1)(A), "[t]o be disabling, limitations must persist for a continuous period of no less than twelve months."  (*Id.* at 12-13.)

In reply, Plaintiff repeats the arguments concerning PMHNP McCarthy raised in his opening brief without specifically addressing the Commissioner's arguments.  (Doc. 14 at 2-4.)

5.   Analysis

The ALJ's evaluation of PMHNP McCarthy's opinions was free of harmful error for essentially the same reasons as the ALJ's evaluation of Dr. Morton's opinions.

First, the ALJ expressly considered the supportability and consistency factors when evaluating PMHNP McCarthy's opinions, as required under the new SSA regulations.  (AR at 27.)

Second, the ALJ's assessment of the supportability factor was supported by

substantial evidence.  Among other things, the ALJ stated that PMHNP McCarthy's opinions were "not supported by treatment notes nor analysis."  (*Id.*)  This is correct—PMHNP McCarthy did not provide any explanation for his checkbox opinions in the narrative section of the form—and Plaintiff does not acknowledge this aspect of the ALJ's analysis in his briefs.

Third, at least one aspect of the ALJ's assessment of the consistency factor was supported by substantial evidence.  Like Dr. Morton, PMHNP McCarthy opined that Plaintiff would have significant limitations in his social interactions—among other things, PMHNP McCarthy opined that Plaintiff would have "moderately severe" limitations in his ability to maintain attention and concentration for extended periods and would have "moderate" limitations in his abilities to interact appropriately with the general public.  (*Id.* at 504-05.)  It was rational for the ALJ to conclude that these opinions were inconsistent with the evidence, discussed above in relation to Dr. Morton, that Plaintiff was able to maintain attention and focus and displayed a cooperative attitude during his interactions with Dr. Webster and the medical provider at Native Health, both of whom were strangers to Plaintiff at the time of the interactions.  *Ghanim*, 763 F.3d at 1163; *Thomas*, 278 F.3d at 954.

Fourth, in light of these conclusions, any errors in other aspects of the ALJ's consistency analysis as to PMHNP McCarthy were harmless, as was the ALJ's decision to use the same repetitive language when assessing the opinions of the various medical sources in this case.

C. **Dr. Geary**

1. Standard Of Review

The ALJ's evaluation of Dr. Geary's opinions is subject to the same standard of review, set forth in Part IV.A.1 above, that governs the ALJ's evaluation of Dr. Morton's opinions.

2. Dr. Geary's Opinions

On December 21, 2021, Dr. Geary met with Plaintiff to "assess [his] current

psychological functioning and ability to perform work-related activities."  (AR at 530.)
Afterward, on January 7, 2022, Dr. Geary drafted a report summarizing his observations
and findings.  (*Id.* at 530-37.)  In a nutshell, Dr. Geary concluded as follows:

> On the practical level, [Plaintiff's] disorders negatively impact his ability to
> be[] around people (including dealing with the public), to sustain
> concentration, to remember material on an intermediate or long-term basis,
> to maintain regular attendance, to complete tasks in a timely fashion, to
> tolerate customary works stress, to behave in an emotionally stable manner
> without exhibiting behavioral extremes, and to persist at duties without
> excessive breaks or other interruptions.  Psychotropic medication in general
> does very little to curtail the features of OCD.  [Plaintiff] did not find
> particular benefit when taking medication for depression, anxiety, or sleep.
> Counseling has been supportive but not especially therapeutic.
> Unfortunately, the prognosis for [Plaintiff] is poor . . . .
>
> All in all, there is very little that is hopeful which can be offered regarding
> [Plaintiff's] present or future status.  It is difficult for those of us who are not
> affected by OCD, Major Depression, Social Anxiety, or panic to suitably
> appreciate the torment and anguish that these conditions inflict.  But. it is
> proper to at least try, to attempt to imagine what a day might be like living
> under the psychosocial conditions that [Plaintiff] does.  Such an exercise in
> empathy would be illuminating and, hopefully, facilitate a humane response.

(*Id.* at 536-37.)

    Also on January 7, 2022, Dr. Geary filled out four checkbox questionnaires
concerning Plaintiff.  First, in a form entitled "Mental Residual Functional Capacity
Assessment," Dr. Geary checked boxes indicating, among other things, that Plaintiff would
have a "severe" limitation in his ability to interact appropriately with the general public.
(*Id.* at 538-40.)  Second, in a form entitled "Listing Questionnaire 12.04," Dr. Geary
checked boxes indicating that Plaintiff would have "moderate" limitations in his ability to
understand, remember, or apply information and in his ability to adapt or manage oneself
and would have "marked" limitations in his ability to concentrate, persist, or maintain pace
and in his ability to interact with others.  (*Id.* at 541-43.)  Third, in a form entitled "Listing
Questionnaire 12.06," Dr. Geary checked boxes indicating that Plaintiff would have a
"moderate" limitation in his ability to understand, remember, or apply information; would

have a "marked" limitation in his ability to concentrate, persist, or maintain pace and in his ability to adapt or manage oneself; and would have an "extreme" limitation in his ability to interact with others.  (*Id.* at 544-46.)   Fourth, in a form entitled "Substance Abuse Questionnaire," Dr. Geary wrote that "[t]here is no cannabis use disorder in this case." (*Id.* at 547.)

### 3.   The ALJ's Evaluation of Dr. Geary's Opinions

As noted, the ALJ deemed Dr. Geary's opinions "not . . . persuasive."  (*Id.* at 28.) The ALJ's full rationale was as follows:

> The undersigned does not find Dr. Geary's opinion persuasive despite supporting exam findings as the severity of the limitations are inconsistent with the entirety of the record.  The medical evidence supports that the claimant suffers from bipolar disorder II; major depressive disorder; borderline intellectual functioning; social anxiety disorder with agoraphobic features; and obsessive-compulsive disorder.  The claimant attended outpatient therapy and was prescribed psychiatric medication, however he testified he no longer does either.  The claimant reported he has struggled with depression, social anxiety with panic, obsessions and compulsions since he was a child.  He reported doing rituals for three to five hours a day.  The claimant had a depressed and anxious mood.  At times, he had an obsessional and depressive and thought content, which is consistent with moderate limitations.  However, the claimant is able to perform within the above residual functional capacity.   The claimant demonstrated average intelligence, which is consistent with the IQ testing results being in the low average range.  The claimant had a normal memory.  He was able to maintain attention and focus.  The claimant was able to recall three, of five, words after a delay.  He was also able to repeat five numbers forwards and three backwards.  Further, the claimant was able to perform serial 7's.  He was able to repeat, word for word, two sentences dictated to him.   [H]e was cooperative and made eye contact.  On occasion, the claimant had a normal mood and affect.  Moreover, the claimant had a logical thought process.  He had normal insight and judgment.  At times, the claimant had a normal thought content.  For the aforementioned reasons, the undersigned does not find Dr. Geary's opinion persuasive.

(*Id.* at 28, citations omitted.)

### 4.   The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of Dr. Geary's opinions was flawed

because the ALJ "us[ed] almost word-for-word the rationale she used to discount Dr. Morton's and PMHNP McCarthy's opinions," which was "based on factual inaccuracies and was not supported by substantial evidence." (Doc. 11 at 13-14.)  Additionally, Plaintiff argues that the ALJ erred by "taking [Plaintiff's] ability to participate in a one-on-one examination with a doctor out of context." (*Id.* at 14.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting Dr. Geary's opinions.   (Doc. 13 at 13-14.)   More specifically, the Commissioner argues that even though the ALJ resolved the supportability factor in Dr. Geary's favor, it was still permissible for the ALJ to discount Dr. Geary's opinions based on the consistency factor.  (*Id.*)

In reply, Plaintiff repeats the arguments concerning Dr. Geary raised in his opening brief without specifically addressing the Commissioner's arguments.  (Doc. 14 at 2-5.)

5.   Analysis

The ALJ's evaluation of Dr. Geary's opinions was free of harmful error.

As an initial matter, the ALJ expressly considered the supportability and consistency factors when evaluating Dr. Geary's opinions, as required under the new SSA regulations. (AR at 28.)  Additionally, and unlike the case with Dr. Morton and PMHNP McCarthy, that ALJ found that the supportability factor enhanced the persuasiveness of Dr. Geary's opinions.  (*Id.*)[4]  Nevertheless, despite that determination, the ALJ chose to discredit Dr. Geary's opinions because they were undermined by the consistency factor.  That was a permissible approach under Ninth Circuit law.  *Woods*, 32 F.4th at 793 n.4; *Palmer*, 2024 WL 1904347 at *1.

The ALJ's adverse finding as to the consistency factor was also supported by substantial evidence.  Like Dr. Morton and PMHNP McCarthy, Dr. Geary opined that Plaintiff would have extreme limitations in his ability to interact with others.  (*See, e.g.*,

---

[4]    This evidence that the ALJ provided an individualized analysis when considering each medical source's opinion, and in fact reached differing conclusions on a source-by-source basis as to the supportability factor, is one reason why Plaintiff is not entitled to relief based on his contention that "the ALJ repeated almost word-for-word the same paragraph in assessing each medical opinion." (Doc. 14 at 2.)

AR at 536 ["[Plaintiff's] disorders negatively impact his ability to be[] around people (including dealing with the public) . . . [and] behave in an emotionally stable manner without exhibiting behavioral extremes . . . ."]; *id.* at 539 [checkbox indicating that Plaintiff would have a "severe" limitation in his ability to interact appropriately with the general public]; *id.* at 545 [checkbox indicating that Plaintiff would have an "extreme" limitation in his ability to interact with others].)  It was rational for the ALJ to conclude that these opinions were inconsistent with the evidence, discussed above in relation to Dr. Morton, that Plaintiff was able to maintain attention and focus and displayed a cooperative attitude during his interactions with Dr. Webster and the medical provider at Native Health. *Ghanim*, 763 F.3d at 1163; *Thomas*, 278 F.3d at 954.  Thus, any any errors in other aspects of the ALJ's consistency analysis as to Dr. Geary were harmless.

D.     **Evaluation Of Plaintiff's Testimony**

1.     Standard Of Review

Under Ninth Circuit law, an ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (citation omitted).  If so, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citation omitted). Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "offering specific, clear and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015) (citation omitted).

2.     Plaintiff's Symptom Testimony

As summarized in the ALJ's decision (in a passage whose factual accuracy Plaintiff does not dispute), "the claimant alleges entitlement to disability benefits based upon a combination of severe mental impairments.  The claimant reported he suffers from obsessive compulsive disorder, bipolar disorder, anxiety disorder and depression.  The claimant reported having mood swings and that he gets stuck within his own head.  He

1  described his compulsions cause him to do a series of repetitive steps and processes or that

2  something bad will happen to him or others.  The claimant testified if he cannot do his

3  rituals he gets emotional and has trouble communicating.  In addition, he reported having

4  visual hallucinations.    The claimant reported having difficulty with his memory,

5  completing tasks, concentrating, understanding, following instructions and getting along

6  with others.  Moreover, the claimant testified he stopped seeing his psychiatrist and taking

7  his medication because he did not find them helpful.  However, he testified he has an

8  upcoming counseling appointment with a new therapist."  (AR at 21.)

9              3.    <u>The ALJ's Evaluation Of Plaintiff's Symptom Testimony</u>

10        The ALJ provided what the Court construes as two reasons for discounting the

11  credibility of Plaintiff's symptom testimony.  First, the ALJ stated that Plaintiff's testimony

12  was inconsistent with the objective medical evidence in the record, which included

13  evidence that, during certain evaluations, Plaintiff "was alert and oriented," "denied having

14  homicidal and suicidal ideations," "denied having visual or auditory hallucinations," "was

15  cooperative and made eye contact," "[o]n occasion . . . had a normal mood and affect,"

16  "demonstrated average intelligence during mental status examinations," "denied having

17  difficulty concentrating," "had a logical thought process," "had normal insight and

18  judgment," "[a]t times . . . had a normal thought content," and "was cooperative and had a

19  euthymic mood."  (*Id.* at 23.)  In a related vein, the ALJ emphasized that "[d]espite his

20  reports of time consuming and distracting rituals, the claimant was able to attend two

21  psychological examinations," "drove himself to the examination arranged by his attorney

22  and arrived 40 minutes early, suggesting that he has the ability to plan according to timely

23  attend to obligations," and "did not require any 'unusual time' [to] complete tasks for the

24  mini-mental status examination."  (*Id.*)   The ALJ continued: "In these two arguably

25  stressful setting[s], the claimant was able to control his psychologically-based symptoms—

26  in particular the need to complete rituals—in order to timely present for the evaluation and

27  maintain attention and focus to complete the testing.  Neither examining psychologist made

28  any mention of the claimant performing any rituals during the evaluations.  Thus, while the

claimant testified that his rituals are time consuming causing it to be hard to be on a schedule, and he gets emotional if he cannot do them, the claimant appears to have some degree of control over his symptoms such that he can engage with strangers and complete a variety of tasks." (*Id.* at 24.)

Second, the ALJ also stated that Plaintiff's testimony was inconsistent with his ability to "engage[] in a somewhat normal level of daily activity and interaction." (*Id.*) The ALJ elaborated that Plaintiff "admitted to activities of daily living including household chores, preparing meals, performing selfcare activities such as dressing and bathing, socializing with others, and displaying sufficient concentration and attention to play video games.  The claimant also testified that for two years, he babysat his cousin's baby for several hours a day for approximately two years.  The ability to care for a young child demonstrates substantial mental abilities, including the abilities to focus, concentrate, and interact.  Some of the abilities and social interactions required in order to perform these activities were the same as those necessary for obtaining and maintaining employment. The undersigned finds the claimant's ability to participate in such activities was inconsistent with his allegations of functional limitations." (*Id.*)

#### 4.    The Parties' Arguments

Plaintiff argues that the ALJ provided legally insufficient reasons for discrediting his symptom testimony.  (Doc. 11 at 14-17.)  As for the ALJ's finding of inconsistency with the medical evidence, Plaintiff accuses the ALJ of improperly "singl[ing] out a few periods of temporary well-being from a sustained period of impairment"; argues that, "[a]s discussed above with regard to the medical evidence, the fact that [Plaintiff] was able to attend and engage in two psychiatric examinations is not in and of itself evidence that [Plaintiff] would be able to adhere to a schedule, maintain focus, and interact appropriately with others on a regular and continuing basis in a work setting;" and contends that "the ALJ identified no particular findings inconsistent with any of the specific functional deficits [Plaintiff] described." (*Id.* at 16-17, cleaned up.)  As for the ALJ's finding of inconsistency with daily activities, Plaintiff argues that "the activities of daily living cited

by the ALJ are not inconsistent with [Plaintiff's] testimony that he is unable to sustain focus, remember instructions, or attend work on a reliable basis as a result of his mental health symptoms"; that "[t]he Social Security Act does not require that disability claimants be totally unable to engage in any form of mental or physical activity"; and that although Plaintiff "did report helping care for his cousin's baby . . . [he] noted that his mother was always there and that she performed much of the childcare." (*Id.* at 16.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting Plaintiff's symptom testimony. (Doc. 13 at 3-9.) As for the finding of inconsistency with the medical evidence, the Commissioner argues that it was rational for the ALJ to conclude that Plaintiff's testimony that he is unable to work because he has a "really hard time" with "rituals," such as compulsions and frequent hand washing, was inconsistent with Plaintiff's ability to complete two mental status examinations without engaging in such conduct. (*Id.* at 4-5.) As for the finding of inconsistency with daily activities, the Commissioner argues that it was rational for the ALJ to conclude that Plaintiff's testimony regarding his "frequent, disruptive compulsions" was inconsistent both with Plaintiff's ability to attend and complete the mental status examinations without incident and with Plaintiff's babysitting activities. (*Id.* at 5-6.) The Commissioner also emphasizes that "Plaintiff appears to have downplayed this [babysitting] activity, as he reported watching his cousin's children on the weekends all day, and all of them were under five years old" and also admitted that he only received help from his mother about "half" of the time. (*Id.* at 6-7, cleaned up.)

In reply, Plaintiff reiterates his position that "the activities of daily living cited by the ALJ, including helping care for his cousin's child, are not inconsistent with [Plaintiff's] testimony that he is unable to sustain focus, remember instructions, or attend work on a reliable basis." (Doc. 14 at 6.) Plaintiff also reiterates his position that the ALJ "identified no particularly findings inconsistent with any of the specific functional deficits [Plaintiff] described." (*Id.* at 7.)

…

5.   <u>Analysis</u>

The Court finds no harmful error in the ALJ's evaluation of Plaintiff's symptom testimony.  First, it was permissible for the ALJ to discount Plaintiff's testimony on the ground that it was inconsistent with the objective medical evidence.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.") (citation omitted).  Although this may not serve as an ALJ's sole reason for discounting a claimant's symptom testimony, it is a permissible consideration when (as here) it is coupled with other grounds for an adverse credibility finding.  *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("Claimants like Smartt sometimes mischaracterize [Ninth Circuit law] as completely forbidding an ALJ from using inconsistent objective medical evidence in the record to discount subjective symptom testimony.  That is a misreading of [Ninth Circuit law].  When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.  We have upheld ALJ decisions that do just that in many cases.") (citations omitted); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.").

The ALJ's finding of inconsistency with the objective medical evidence was also supported by substantial evidence.  During the hearing, when asked to describe "why you're unable to work," Plaintiff testified: "I just—I have a lot of these like, same kinda rituals that I do every day.  And I just don't know why.  Like it takes up hours of my day and causes me a lotta stress, causes me a lotta time."  (AR at 48.)  Plaintiff also testified that "it's really hard for me to stay on a schedule.  But it's mostly because I just have a really hard time with these rituals that I have to do every day that consumes my time and my, honestly sanity, 'cause I know, it sounds crazy saying it out loud, but they're real to me, you know, and they cause me a lot of, a lot of issues."  (*Id.* at 49.)  However, following

one of the psychological examinations in this case, Dr. Webster observed that Plaintiff's "Obsessive-Compulsive Disorder did not impair his ability to answer questions appropriately and finish the evaluation with little to no difficulties," that Plaintiff "was able to maintain attention and focus," that Plaintiff "was attentive during the evaluation," and that Plaintiff "did not demonstrate any distress during the evaluation."  (*Id.* at 500-01.) Similarly, following the other psychological examination in this case, Dr. Geary noted that Plaintiff drove himself to the appointment, arriving 40 minutes early, and "presented with normal sensorium, posture, and gait. . . .  Eye contact and attention span were satisfactory. Motor level was normal.  No mannerisms or physiological symptoms were observed. . . . No significant change in comportment occurred during the session.  Behavior was consistent with reported mood.  There was at no time any indication that [Plaintiff] was attending to internal stimuli or responding to other perceptual abnormalities (e.g., delusions, ideas of reference)."  (*Id.* at 529-30.)  It was rational for the ALJ to conclude that Plaintiff's behavior and performance during the two examinations was inconsistent with his testimony that cannot work because he spends "hours" of "every day" performing rituals, which "consume[]" his time and make it difficult for him to stay on schedule.  The Court acknowledges that a different ALJ might have declined to make an inconsistency finding under these circumstances, and instead viewed Plaintiff's performance during the examinations as simply reflecting a temporary lull in his claimed symptoms, but as noted elsewhere in this order, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas*, 278 F.3d at 954.

The ALJ's other reason for discrediting Plaintiff's symptom testimony was that it was inconsistent with Plaintiff's activities of daily living.  This is also a permissible basis for an adverse credibility finding under Ninth Circuit law.  *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("[T]he ALJ may consider inconsistencies . . . between the testimony and the claimant's conduct . . . and whether the claimant engages in daily activities inconsistent with the alleged symptoms.") (cleaned up); *Fry v. Berryhill*, 749 F.

App'x 659, 660 (9th Cir. 2019) ("The ALJ proffered specific, clear, and convincing reasons for discounting Fry's testimony concerning the severity of her symptoms, including inconsistencies between her daily activities and alleged limitations . . . .").

This finding of inconsistency was also supported by substantial evidence.  Plaintiff acknowledged during his hearing testimony that he babysat for his cousin's baby "for about two years" and "did most of the taking care of the baby at that time during the day."  (AR at 52.)  Plaintiff also clarified that his mother only provided assistance with the babysitting about "half the time," such that Plaintiff was solely responsible for taking care of the child for "a couple hours" each day while Plaintiff's sisters were at school and Plaintiff's mother was at work.  (*Id.* at 53.)  Additionally, during his examination by Dr. Geary, Plaintiff stated that he "babysat for his cousin for 2 ½ years from 2017 to 2019" and would "watch his cousin's children," all of whom "were under five years of age," "on the weekends all day."  (*Id.* at 496.)  It was rational for the ALJ to conclude that Plaintiff's ability, over a multi-year period, to serve as the sole care provider for multi-hour stretches of time for a young child was inconsistent with his testimony that he spends "hours" of "every day" performing rituals, which "consume[]" his time and preclude him from working.  *See, e.g., Alo v. Berryhill*, 766 F. App'x 512, 514 (9th Cir. 2019) ("Alo testified she shares tasks such . . . dressing and bathing her children with her husband, and she drives her older child to school four days a week.  Alo reported she also reads stories, does puzzles, and plays board games with her children.  Thus, it was reasonable for the ALJ to discount Alo's testimony that she was physically unable to work at any job as inconsistent with these activities.").

Finally, there is no merit to Plaintiff's contention that the ALJ failed to recognize the "critical differences between activities of daily living and activities in a full-time job" and believed that he needed to be "totally unable to engage in any form or mental or physical activity."  (Doc. 11 at 16, cleaned up.)  The Ninth Circuit has recognized that "[i]nconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination."  *Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014).  This makes sense—a factfinder is entitled to discount

the credibility of a witness who has been shown to have testified in a false or exaggerated manner even if the impeaching daily activities would not, alone, compel a finding of non-disability.  *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (recognizing that a "tendency to exaggerate" is a "specific and convincing reason[]" for discrediting a claimant's testimony); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("To determine whether the claimant's testimony regarding the severity of her symptoms is credible, the ALJ may consider . . . ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid . . . .").  *See generally* 9th Cir. Model Jury Ins. 1.14 ("[I]f you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.").

E.   **Lay Testimony**

Plaintiff's next argument is that the ALJ erred by failing to provide germane reasons for discrediting the lay witness testimony of his sister, his mother, and his mother's boyfriend.  (Doc. 11 at 17-18; Doc. 14 at 7-8.)

This argument is unavailing.  As the Commissioner correctly notes, even assuming the "germane reasons" requirement remains intact under the new SSA regulations, any error here was harmless.  *Wallace v. Comm'r of Soc. Sec. Admin.*, 2023 WL 6389370, *10-11 (D. Ariz. 2023) ("Plaintiff is not entitled to reversal based on his arguments regarding the lay witness statements.  As an initial matter, the Court notes that the Ninth Circuit has not definitively resolved whether ALJs must continue, following the issuance of the new SSA regulations in 2017, to provide reasons for rejecting lay-witness statements. Lower courts have reached conflicting decisions on that issue.  Nevertheless, even assuming the reasoning requirement remains intact, the Ninth Circuit has recognized that the failure to provide such reasoning is harmless where (1) the ALJ provided legally sufficient reasons for rejecting the claimant's symptom testimony and (2) the lay witness did not describe any limitations beyond those identified by the claimant.") (citations omitted).

…

F.      **Step-Five Hypothetical**

Plaintiff's final argument is that the ALJ erred during step five by failing to include all of Plaintiff's limitations and restrictions in the hypothetical posed to the VE.  (Doc. 11 at 19; Doc. 14 at 9.)  However, this argument is premised on the assumption that the ALJ was required to include, in the hypothetical, "[Plaintiff's] credible allegations, the limitations noted by the lay witnesses, and the limitations assessed by Dr. Morton, PMHNP McCarthy, and Dr. Geary." (Doc. 11 at 19.)  Because, as discussed in Parts I.A-I.E above, Plaintiff has not established that the ALJ erred with respect to those issues, Plaintiff's claim of step-five error fails as well.  *Kitchen v. Kijakazi*, 82 F.4th 732, 742 (9th Cir. 2023) ("Kitchen contends that the ALJ erred at step five by relying on the VE's response to an incomplete hypothetical. . . .  [This] argument is a restatement of his contention that the ALJ should have credited Dr. Adams' opinion and completely adopted Dr. Condon's assessment.  Because we have already concluded that the ALJ properly weighed Dr. Adams' opinion and included Dr. Condon's limitations in the RFC, Kitchen has not shown that the ALJ's resulting hypothetical was incomplete.").

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 16th day of September, 2024.

Dominic W. Lanza
United States District Judge